IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BOBBY G. BEAUPRE,

          Plaintiff,                    CIV S-11-0459 GGH

    vs.

MICHAEL J. ASTRUE,              ORDER
Commissioner of Social Security,

          Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act").  For the reasons that follow, Plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

        Plaintiff, born November 9, 1981, applied on October 13, 2006 for disability benefits.  (Tr. at 81.)  Plaintiff alleged he was unable to work since February 25, 2006, due to chronic brain syndrome and a learning disorder.  (Id. at 46, 47.)  In a decision dated January 10, 2008, ALJ Laura Speck Havens determined plaintiff was not disabled.  The ALJ made the

following findings:[1]

1. The claimant last met the insured status requirements of the Social Security Act through September 30, 2006.

2. The claimant has not engaged in substantial gainful activity since February 25, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairment: learning disability (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple repetitive tasks.

6.     The claimant is able to perform past relevant work as a general laborer but I will continue the analysis in the alternative (20 CFR 404.1565 and 416.965).

7.     The claimant was born on November 9, 1981 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 25, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 12 - 18.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A.  Whether the ALJ's Findings at Step 2 are Incomplete, Leading to Errors at Step 3 and in Formulating Plaintiff's Residual Functional Capacity; B. Whether the ALJ Failed to Consider All the Medical Records; C.  Whether the ALJ Made an Improper Credibility Finding; and D.  Whether the ALJ Ignored Lay Witness Evidence.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

3

Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

A.  Step Two

Plaintiff contends that the ALJ failed to find plaintiff's obesity, depression and Attention Deficit Hyperactivity Disorder ("ADHD") to be severe impairments at step two.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered."  SSR 85-28.  The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is a de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  At this step, the ALJ may decline to find a severe impairment *only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).

The ALJ only found plaintiff's learning disability to be a severe impairment.  (Tr. at 14.)   The ALJ did not refer to plaintiff's obesity.

Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005), considered plaintiff's obesity at all stages of the sequential analysis in light of Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003). The Celaya factors include whether, despite plaintiff's failure to specifically raise obesity, it was

raised as a disabling factor in plaintiff's report of symptoms, whether it was clear from the record that the obesity was close to the listing criterion, and could exacerbate the other alleged impairments, and whether the ALJ should have been on notice of the need to develop the record on obesity due to plaintiff's pro se status, in light of his observation of plaintiff and other information in the record.  Id. at 1182.  "Obesity may still enter into a multiple impairment analysis, but only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181 n. 1 (9th Cir. 2003).

The undersigned has reviewed the record for any indication of obesity and found no references other than plaintiff's testimony that he weighs about 300 pounds, and his disability report, indicating a weight of 297 pounds and height of five feet 11 inches.  (Tr. at 39, 95.)  There are no medical treatment records in the file.  It appears that plaintiff could be characterized as extremely obese based on two references.  See www.nhlbisupport.com/bmi.  According to Social Security Ruling 02-1p, his body mass index (BMI) of 41.4 at weights between 297 and 300 categorize him at extremely obese.[2]

Yet plaintiff has submitted no medical records whatsoever, let alone any records suggesting limitations from obesity.  Plaintiff's initial filings with the Social Security Administration did not raise obesity as an impairment, but only his learning disability and chronic brain syndrome.  (Tr. at 46, 47, 49.)  Plaintiff's functional report does not list any physical limitations whatsoever.  (Id. at 108.)  Plaintiff was represented by counsel at his hearing who could have submitted medical records on his behalf, but did not do so, and also failed to raise obesity as an issue in the administrative proceedings.  (Id. at 29.)  At the administrative hearing, plaintiff's counsel questioned him in only a cursory manner about his weight.  He asked him for his weight and height and if that was the reason he occasionally runs short of breath.  He

---

[2] "BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2).  For adults, both men and women, the Clinical Guidelines describe a BMI of 40 and above as 'extreme obesity.'" SSR 02-1p.

1   also asked plaintiff what the doctors had told him about his weight problem.   Although plaintiff

2   responded to these questions, his attorney made no effort to provide medical evidence to support

3   this testimony.  (Tr. at 39.)  Plaintiff's counsel also did not raise obesity as a factor at the Appeals

4   Counsel level, and provided no additional evidence. (Id. at 6-8.)

5         SSR 02-1p makes clear that obesity is a disease that must be considered when

6   evaluating disability, and the "combined effects of obesity with other impairments can be greater

7   than the effects of each of the impairments considered separately."  The ALJ "will evaluate each

8   case based on the information *in the case record*."  (Id. at *6.) (emphasis added).

9         In this case, because there are no medical records whatsoever, including no record

10   of a BMI, there was insufficient evidence or argument to put the ALJ on notice to consider it as a

11   limiting factor, especially in light of the fact that plaintiff had no other physical problems

12   whatsoever that would have been affected by his obesity, including no impairments in his

13   musculoskeletal, respiratory, or cardiovascular system that obesity would have impacted.

14         Plaintiff, at a minimum, should have included medical evidence reflecting his

15   obesity and any problems stemming from his weight.  The ALJ did not have a duty to be

16   plaintiff's advocate in meeting his burden.  Henrie v. United States Dep't of Health & Human

17   Servs., 13 F.3d 359, 361 (10th Cir.1993).  The claimant has the burden of presenting medical

18   evidence demonstrating disability.  42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a), (c), and

19   416.912(a), (c); Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)).  Plaintiff has the

20   ultimate burden of proof to produce the evidence that demonstrates he is disabled, 20 CFR §

21   404.1512(a)**;** Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  Although the ALJ has the

22   burden to develop the record, plaintiff has the burden to bring forward evidence of an

23   impairment.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.

24         In regard to plaintiff's next claimed severe impairment, depression, although the

25   records submitted do include this diagnosis, plaintiff can only establish an impairment if the

26   record includes signs – the results of "medically acceptable clinical diagnostic techniques," such

as tests – as well as symptoms, i.e., plaintiff's representations regarding his impairment.  Ukolov

v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005).  Although plaintiff testified that he saw a

psychiatrist once a month, he was not taking any medication for this diagnosis, but only

medication to help him sleep.  (Id. at 35-36.)  The ALJ specifically asked plaintiff's counsel if he

had records in support, and counsel's answer was equivocal:

>           ALJ: Do I have those records in here, Mr. Yuckt?
>
>           ATTY: I thought they were the updated records we submitted from
>           San Joaquin County Mental Health.  The County shows one from
>           September, that we went through last month.
>
>           ALJ: Last month?
>
>           ATTY: Yes. Through last month.

(Id. at 36.)  Those records referred to by plaintiff's counsel consist of seven pages covering five

visits over a seven month period from February to September, 2007.  (Tr. at 236-43.)  It is true

that plaintiff was diagnosed with depression and ADHD at the initial screening; however, this

diagnosis may have been related to a recent separation from his wife and custody issues over his

son.  (Id. at 243.)  No medication was prescribed.   No other records contain a diagnosis of

depression.  (Id. at 202.)  Furthermore, there is no evidence that plaintiff's depression lasted at

least twelve continuous months.  In order for disability to be found, the condition cannot be

temporary and must be expected to last over at least a twelve month period.  42 U.S.C. §

423(d)(1)(A).

           Plaintiff also asserts the ALJ committed reversible error by failing to follow the

technique for evaluating the severity of mental impairments as set forth in 20 C.F.R. §

404.1520a, specifically in regard to his ADHD.[3]  The regulations require documentation of the

\\\\\

\\\\\

---

[3] Parallel regulations governing supplemental social security are found at 20 C.F.R. § 416.920a.

technique in the ALJ's written decision.[4]  20 C.F.R. § 404.1520a.  The ALJ is required to rate the degree of functional loss resulting from a mental impairment in four broad functional areas. These areas include activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).  After the degree of limitation is rated, the severity of a claimant's mental impairment is determined. 20 C.F.R. § 404.1520a(d).

Throughout the application process, the Commissioner documents the application of the technique.  At the administrative hearing level, the written decision must incorporate the pertinent findings and conclusions based on the technique.  The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas.  20 C.F.R. § 404.1520a(e)(2).  The ALJ must therefore rate, and include in the decision, (1) the claimant's functional limitations in the areas of daily activities, social functioning, and concentration, persistence or pace as being either none, mild, moderate, marked, or extreme; (2) the claimant's episodes of decompensation as either none, one or two, three or four or more.  20 C.F.R. § 404.1520a(c)(3)-(4), (e)(2).  Where the degree of limitation in the first three functional areas is none or mild and none in the fourth area, the impairment is generally considered non-severe.  20 C.F.R. § 404.1520a(d)(1).

Plaintiff cites Keyser v. Commissioner Social Sec. Admin., 648 F.3d 721, 725 (9th Cir. 2011), claiming that the ALJ failed to document use of the technique in the decision. Keyser states that although attachment of the PRTF to the decision is no longer required, "the

---

[4]  Gutierrez v. Apfel, 199 F.3d 1048 (9th Cir. 2000), has been superseded by regulation. Previously, a PRTF (Psychiatric Review Technique Form) was required to be appended to the ALJ's decision.  The regulation now only requires that the pertinent findings and conclusions based on the technique be incorporated into the decision.  The regulation requiring incorporation of the findings and conclusions into the decision allows for meaningful review by the court in determining whether substantial evidence supports the ALJ's findings.

Social Security Regulations require the ALJ to complete a PRTF and append it to the decision, or to incorporate its mode of analysis into the ALJ's findings and conclusions." Id. at 726.

In this case, the ALJ relied on Dr. Hurwitz's PRTF, completed January 4, 2007. (Tr. at 16.) Although this psychiatrist found a learning disorder and attention deficit disorder, he found that plaintiff had no severe mental impairment. (Id. at 205-06.) See 20 C.F.R. § 404.1520a(d)(1) (stating that a "mild" degree of limitation generally suggests that impairment is not severe). The ALJ properly recorded these findings in her decision and gave them great weight based on Dr. Hurwitz's specialty of psychiatry. (Id. at 16-17.) The ALJ went further than Dr. Hurwitz, however, in finding that plaintiff's learning disorder was a severe impairment. (Id. at 14.)

The fact that the ALJ failed to analyze plaintiff's ADHD pursuant to 20 CFR 404.1520a was harmless error in that she relied extensively on examining practitioners Mattesich and Wakefield, who also diagnosed ADHD, learning disorder, and malingering. (Id. at 202.) They found that "it was not possible to accurately appraise his overall functioning level due to his decision to malinger on the tests." (Id.) In any event, they concluded that he "exhibited adequate social skills for typical kinds of simple interpersonal situations." (Id. at 203.) The ALJ also limited plaintiff to simple repetitive tasks to account for plaintiff's learning disorder, which would in turn compensate for plaintiff's ADHD, even though it was not a severe impairment and was not required to be considered. (Id. at 15.)

Moreover, as discussed in Hoffman v. Astrue, 2012 WL 1027811, *5 (E.D. Cal. 2012):

> a "[f]ailure to document the application of the technique in the opinion requires reversal if the plaintiff had a colorable claim of a mental impairment." Warren v. Astrue, No. 2: 10–cv–3102–SU, 2012 WL 864543, at *4 (D.Or. Mar.13, 2012) (emphasis added). See Keyser, 648 F.3d at 726 ("An ALJ's failure to comply with 20 C.F.R. § 404.1520a is not harmless if the claimant has a colorable claim of mental impairment."); Gutierrez v. Apfel, 199 F.3d 1048, 1051 (9th Cir.2000) ("Our decision is consistent with cases that have held that the failure to fill out the PRTF does not require

1    reversal in situations where there is no viable claim of mental
     impairment.").
2

3          Here, the ALJ correctly found that plaintiff had no colorable mental impairment in

4    regard to ADHD, but only in regard to his learning disability.  Therefore, the ALJ's failure to

5    comply with 20 CFR § 1520a in regard to ADHD was harmless.

6          In sum, the ALJ correctly found that plaintiff's obesity, depression and ADHD

7    were not severe impairments based on an utter lack of evidence to support such a finding.

8          B.  Step 3

9          Plaintiff contends that the ALJ's Step 3 analysis is flawed because she erred in

10   failing to find plaintiff's ADHD, depression and obesity were severe impairments.  Plaintiff also

11   contends that he meets Listing 12.05C based on his IQ of 66 along with a severe impairment.

12   Plaintiff further argues that the ALJ's bare boilerplate finding under step 3 was inadequate.

13         The Regulations' "Listing of Impairments" ("Listings"), lists impairments to

14   thirteen categories of body systems which are severe enough to preclude any gainful activity.

15   Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).  When all the

16   requirements of a listing are met, the described condition is irrebuttably presumed disabling.

17   Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. § 404.1520(d).

18         At the third step of the disability analysis, the ALJ determines whether a person's

19   condition either "meets" or "equals" a listing.  A mere *diagnosis* of a listed impairment is not

20   sufficient.  Specific findings included in each listing also must be met.  See, e.g., Key v. Heckler,

21   754 F.2d 1545, 1550 (9th Cir. 1985).  Alternatively, other diagnostic tests, or the combined

22   effects of various conditions, may demonstrate the "equivalent" of the specific required findings.

23   See, e.g., Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990).

24   In sum, however, unless an impairment is as severe as and has lasted as long as described in the

25   listing, a person is not presumptively disabled.  Young, 911 F.2d at 183.

26   \\\\\

                                        10

First, the ALJ properly found that plaintiff's ADHD, obesity and depression were not severe impairments, as discussed in the previous section.   Therefore, these conditions were not required to be considered at Step 3.

Second, the ALJ's analysis at this step was adequate.   The ALJ determined in finding no. 4 of the decision that plaintiff did not have an impairment that met or equaled the Listings.   She explained: "[n]o treating or examining physician has mentioned findings that meet or are equivalent in severity to the criteria of any listed impairment ...." (Id. at 14.)   The opinion contains no further analysis on this issue; however, further analysis was not required where plaintiff failed to proffer any evidence indicating that a listing could be met.   The only severe impairment found by the ALJ was a learning disability.   This condition, by itself, cannot meet a listing.

Third, plaintiff contends that his IQ of 66, along with "a severe impairment," meets or equals Listing 12.05C.

Listing 12.05 provides in part:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[5]
     The required level of severity for this disorder is met when the requirements in A, B, C, **or** D are satisfied.
...
C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work- related limitation of function;
...

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(c).  (emphasis added).

"An impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal."

---

[5]  Indeed, in the DSM-IV, in order to be considered mentally retarded, one must exhibit this retardation prior to age 18.  DSM IV-TR at 41.

1    Fanning v. Bowen, 827 F.2d 631, 633 (9th Cir. 1987).  This, in other words, is the definition of a

2    "severe" impairment.  Thus, in this circuit, a person who has a severe physical or other mental

3    impairment, as defined at step two of the disability analysis, apart from the decreased intellectual

4    function, meets the second prong of the §12.05C listing.  Id.; see also Hinkle v. Apfel, 132 F.3d

5    1349, 1352 (10th Cir. 1997); Edwards v. Heckler, 736 F.2d 625, 629-31 (11th Cir.1984); Nieves

6    v. Secretary of Health & Human Servs., 775 F.2d 12, 14 & n. 7 (1st Cir.1985)).  Indeed, in

7    footnote 3 of the Fanning decision, the court found that the "extra" impairment need not even

8    reach the "severe" limit; although one might be hard pressed to call a less than "severe"

9    impairment, an impairment at all.

10           In Fanning, the first prong of the listing was met because plaintiff's IQ was found

11   to be between 60 and 69.  Fanning, 827 F.2d at 633.  The court imposed a standard applicable to

12   the second prong, that the impairment must have more than a slight or minimal effect on

13   plaintiff's ability to perform basic work activities.  Id.  Because the ALJ had not considered this

14   question in regard to the plaintiff's knee injury, the court remanded the matter.  Id.

15           In the instant case, the ALJ found that plaintiff's only severe impairment was his

16   learning disability.  (Tr. at 14.)  Subsection C is not met, however, because plaintiff does not

17   have a valid verbal, performance, or full scale IQ of 60 through 70.  In 1996, at age 15, plaintiff's

18   verbal IQ was found to be 73.  His performance IQ was 100.  His full scale IQ at this time was

19   84.  (Id. at 167-68.)  In 2005, at age 23, plaintiff was again tested at San Joaquin Delta College.

20   His BIA (brief intellectual ability) score was estimated to be between 72 and 79.  (Id. at 172.)  On

21   December 6, 2006, plaintiff's IQ was again tested by Mattesich and Wafefield.  Verbal IQ was

22   70, performance IQ was 67, and full scale IQ was 66.  (Id. at 201.)  These scores were found to

23   be inaccurate "due to a lack of effort on [plaintiff's] part," and invalid "due to malingering."  (Id.

24   at 200, 201.)  The ALJ relied greatly on this report, and substantial evidence supports his

25   decision to do so.  Without an accurate IQ from this exam, but considering plaintiff's IQ scores

26   from one year earlier, as well as the earlier testing during high school, plaintiff does not meet the

1  requirement of Listing 12.05C.  The ALJ was not required to analyze this listing without

2  evidence that plaintiff met the basic IQ requirement for it.

3         Without any other basis for considering the Listings, the ALJ's analysis was

4  sufficient.

5         C.  Plaintiff's Credibility

6         Plaintiff contends that the ALJ rejected his credibility based on impermissible

7  factors, such as his "appearance, presentation and demeanor" at the hearing.

8         The ALJ determines whether a disability applicant is credible, and the court defers

9  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

10  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

11  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

12  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

13  supported by "a specific, cogent reason for the disbelief").

14         In evaluating whether subjective complaints are credible, the ALJ should first

15  consider objective medical evidence and then consider other factors.  Vasquez v. Astrue, 572

16  F.3d 586, 591 (9th Cir. July 8, 2009);  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en

17  banc).  The ALJ may not find subjective complaints incredible solely because objective medical

18  evidence does not quantify them.  Bunnell at 345-46.  If the record contains objective medical

19  evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

20  of the alleged symptoms, including aggravating factors, medication, treatment, and functional

21  restrictions.  See Vasquez, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

22  reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

23  explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

24  \\\\\

25  \\\\\

26  \\\\\

1    activities.[6] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61

2    FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

3    testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

4    and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

5    (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

6    v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

7    Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

8    her impairment "could reasonably have caused some degree of the symptom." Vasquez, 572

9    F.3d at 591 (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80

10    F.3d at 1282).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting

11    applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

12          Citing Perminter v. Heckler, plaintiff argues that in the Ninth Circuit, an ALJ's

13    reliance on personal observations at a hearing has been condemned as "sit and squirm"

14    jurisprudence. 765 F.2d 870, 872 (9th Cir. 1985).  The Ninth Circuit determined that benefits

15    cannot be denied based on an ALJ's observation when a claimant's "statements to the

16    contrary...are supported by objective evidence." Id., at 872, citing Coats v. Heckler, 733 F.2d

17    1338, 1341 (9th Cir. 1984).

18          Plaintiff's credibility was properly questioned for the reasons pointed out by the

19    ALJ.  First, the ALJ admittedly based his credibility decision in part on plaintiff's "generally

20    unpersuasive appearance, presentation and demeanor while testifying at the hearing."  (Id. at 16.)

21    He emphasized, however, that "this observation is only one among many being relied on in

22    reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's

23

---

24        [6] Daily activities which consume a substantial part of an applicants day are relevant.
"This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
25    any way detract from her credibility as to her overall disability.  One does not need to be utterly
incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
26    (quotation and citation omitted).

residual functional capacity and not determinative." (Id.)  Plaintiff's statements to the contrary

are not supported by objective evidence in this case.  The ALJ's remaining analysis bears this

out.  Plaintiff testified that he could do his past work as a truck washer, but that he wanted to get

a better job.  (Id.)  Plaintiff takes issue with the ALJ's characterization of this statement.  The

transcript is set forth here in context:

> Q And when you worked, how did that --
>
> A I couldn't move up because I couldn't read or write.  At the time
>
> I had a family and stuff.  I wanted to just work and stuff.
>
> Q And you worked as a truck washer.  Why did you need to learn
>
> to read or write for that job?
>
> A Because I didn't want to be a truck washer my whole life.
>
> Q Okay, but you were able to do that job, you just wanted to do
>
> something better?
>
> A Do something better.  Everybody wants to do something better.

(Id. at 37.)  Plaintiff's answer did not respond to the ALJ's question of whether he was able to do

that job, but only to the second part of the question, that he wanted to do something better.

Nevertheless, from the remainder of the dialogue it is clear that plaintiff in no way denied that he

could do that job, or stated that he was unable to do this past work, but only that he wanted to do

something different.  In any event, the remainder of the objective evidence supports the ALJ's

decision in this regard.

The ALJ based his decision on inconsistencies between plaintiff's assertions and

information in documentary and medical reports.  The ALJ noted that plaintiff was able to drive a

car and do some housework, which did not support the limitations to be expected based on his

complaints.  Although plaintiff watched television all day, he also helped care for his child.  (Id.

at 16.)  Plaintiff's Function Report indicated that he would go shopping, and attended football

games.  (Id. at 106-107.)  Furthermore, the medical records do not reflect continuous and

ongoing treatment that would be expected for a totally disabled individual.  In fact, there was a

complete dearth of medical records, and the few records submitted do not support plaintiff's

subjective symptoms.  (Id. at 16.)

　　　　　　　For example, Bud Swanson completed a career assessment report on April 6,

2005, which plaintiff claims the ALJ paraphrased in a selective manner.  In fact, the ALJ

accurately summarized this report.  She quoted Mr. Swanson's statement that plaintiff "may have

the necessary profile for success in any of his chosen career options, although he is extremely

limited to administrative support position, preferably in a janitorial or construction environment,

although he may be able to be trained to operate a machine."  (Id. at 16, quoting tr. 228.)  The

ALJ also noted Mr. Swanson's final observation that plaintiff should consider janitorial work, or

work as a machine operator or general laborer.  He concluded that this report indicated that

plaintiff could do other work.  (Id.)  It is true that this report also found that plaintiff had a "very

limited prognosis for career goal achievement," and that he would do best in a job where he can

learn by repetition, with no reading or writing required, and that the ALJ did not mention these

statements.  The ALJ is not required to discuss every piece of evidence; however, the record does

need to demonstrate that he considered all of the evidence, and in this case it does.  Clifton v.

Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (finding ALJ's summary conclusion that

appellant's impairments did not meet or equal any Listed Impairment was a bare conclusion

beyond meaningful judicial review).  The report does not state, as plaintiff implies, that plaintiff

can only do some jobs "with massive training and supportive supervision."  (Pl.'s Mot., at 10, tr.

at 228.)

　　　　　　　The ALJ also discussed the Psychiatric Review Technique prepared by Dr.

Hurwitz, as discussed *supra*, and gave great weight to this report.  As mentioned, this psychiatrist

found that plaintiff had no severe impairments, despite a finding of a learning disorder and ADD.

(Id. at 16.)  Finally, the ALJ gave great weight to the psychological examination report conducted

on December 5, 2006, in which plaintiff was found to be malingering.  (Id. at 17, 201.)  The ALJ

1   summarized this report which noted that plaintiff cleaned up around the house and helped his

2   mother with chores.  He was diagnosed with a learning disorder, ADHD, and malingering.  He

3   was assigned a GAF score of 70[7]; however, he did not appear to put forth his best effort in

4   testing.  (Id. at 17, 199.)  In fact, all tests were considered invalid due to malingering.  (Id. at 201-

5   02.)

6          Other than the aforementioned medical records, which for the most part were

7   created for purposes of plaintiff's applications for Social Security, and some educational records,

8   there are no medical treatment records of any kind in the record, and the mental health treatment

9   records, as described supra, indicate only a few visits in 2007.  (Tr. at 237-243.)  For these

10   reasons, the undersigned finds that the ALJ gave clear and convincing reasons in support of his

11   credibility analysis, which is supported by the record.

12      D.  Plaintiff's Past Work

13          Plaintiff contends that the ALJ erred in finding that his past work as general

14   laborer and truck washer qualified as substantial gainful activity because he did not earn enough

15   money at each job.  "'Substantial gainful activity' is: ... work activity that 'involves doing

16   significant physical or mental activities' on a full or part-time basis, and is the 'kind of work

17   usually done for pay or profit, whether or not a profit is realized.'"  20 C.F.R. §§ 416.972(a) &

18   (b).  Byington v. Chater, 76 F.3d 246, 248 (9th Cir. 1995) citing Katz v. Sec. HHS, 972 F.2d 290,

19   292 (9th Cir. 1990).

20

21          The concept of substantial gainful activity involves the amount of
            compensation and the substantiality and gainfulness of the activity
            itself.  20 C.F.R. § 404.1532(b); Chicager v. Califano, 574 F.2d

22

23          [7] GAF is a scale reflecting the "psychological, social, and occupational functioning on a
     hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental

24   Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, A GAF of 61-70 indicates
     "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social,

25   occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
     generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV at

26   32.

1      161, 163 (3d Cir.1978).  The mere existence of earnings over the
       statutory minimum is not dispositive.  Chicager, 574 F.2d at 163.
2      However, there is a presumption of substantial gainful employment
       if the applicant earns over the amount specified in the guidelines.
3      20 C.F.R. §§ 404.1574(b)(2), 404.1575(b)(2); Josefowicz v.
       Heckler, 811 F.2d 1352, 1356 (10th Cir.1987).  The claimant may
4      rebut a presumption based on earnings with evidence of his
       inability to be self-employed or to perform the job well, without
5      special assistance, or for only brief periods of time.  Anderson v.
       Heckler, 726 F.2d 455, 456 (8th Cir.1984).

6

7      Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th Cir. 1990).

8              In this case, the ALJ found that plaintiff could do his past relevant work as a

9      general laborer or truck washer based on the vocational expert's testimony that it was medium

10     unskilled work.  (Id. at 17, 41.)  Plaintiff disagrees that these jobs constitute substantial gainful

11     activity because his earnings did not reach SGA levels.

12             The record indicates that plaintiff worked as a truck washer for six months in

13     2005, and for two weeks as a laundry worker, and earned $8,416.27 that year.  (Tr. at 122, 89.)  If

14     his earning period is rounded up to seven months for ease of computation, his earnings were

15     therefore $1,202.32 per month.  This amount indicates he is well above the dollar limit that will

16     create a presumption of substantial gainful employment.  See Monthly See Monthly Substantial

17     Gainful Activity Amounts Chart, available at http:// www.ssa.gov/OACT/COLA/sga.html (more

18     than $830/month for year 2005 are earnings that ordinarily show substantial gainful activity).

19     Plaintiff's argument is based on the faulty calculation that plaintiff worked for a full twelve

20     months to make these earnings.  Plaintiff's argument on this issue therefore fails.

21             E.  Whether the ALJ Erred in Utilizing the Grids Instead of a Vocational Expert

22             Plaintiff contends that the ALJ questioned the vocational expert only about

23     plaintiff's past work, but did not pose a hypothetical question.  Plaintiff claims this was error due

24     to his mental problems, obesity, illiteracy, and limited education.

25             The Guidelines in table form ("grids") are combinations of residual functional

26     capacity, age, education, and work experience.  At the fifth step of the sequential analysis, the

1   grids determine if other work is available.  See generally Desrosiers v. Secretary of Health and

2   Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

3          The grids may be used if a claimant has both exertional and nonexertional

4   limitations, so long as the nonexertional limitations do not significantly impact the exertional

5   capabilities.[8] Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds,

6   Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  The ALJ, however, is not

7   automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional

8   limitation.  Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged

9   does not automatically preclude application of the grids.");  20 C.F.R. pt. 404, subpt. P, app. 2, §

10  200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience,

11  education, and psychological and physical impairments to determine whether a nonexertional

12  limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846

13  F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe,

14  may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such

15  a case, the guidelines would be inapplicable."  Desrosiers, 846 F.2d at 577-78.  The ALJ is then

16  required to use a vocational expert.  Aukland v. Massanari, 257  F. 3d. 1033 (9th Cir. 2001).

17         Plaintiff requests consideration of nonexertional impairments which were

18  previously found to be not severe.  The ALJ found only plaintiff's learning disability to be a

19  severe impairment, which is supported by the record.  See discussion supra Section A.  The ALJ

20  did consider this impairment in limiting plaintiff to simple repetitive tasks and entry level work.

21

22         [8]  Exertional capabilities are the "primary strength activities" of sitting, standing, walking,
    lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary;
23  Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include
    mental, sensory, postural, manipulative and environmental matters which do not directly affect
24  the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper,
    880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).  "If a claimant has
25  an impairment that limits his or her ability to work without directly affecting his or her strength,
    the claimant is said to have nonexertional (not strength-related) limitations that are not covered
26  by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

1  (Id. at 14-15, 18.)  As a result, the ALJ found that plaintiff could do his past work which the VE

2  found was medium and unskilled.  (Id. at 41.)  In her decision, she noted that although plaintiff's

3  ability to work had been compromised by his nonexertional limitations, they had "little or no

4  effect on the occupational base of unskilled work at all exertional levels."  (Id. at 18.)  The ALJ

5  concluded that plaintiff could do the full range of work at all exertional levels under the grids.

6  (Id. at 18.)

7          Unskilled work includes the ability to understand, carry out and remember simple

8  instructions.  SSR 85-15.  This ruling states:

9          The basic mental demands of competitive, remunerative, unskilled
        work include the abilities (on a sustained basis) to understand,
10        carry out, and remember simple instructions; to respond
        appropriately to supervision, coworkers, and usual work situations;
11        and to deal with changes in a routine work setting.  A substantial
        loss of ability to meet any of these basic work-related activities
12        would severely limit the potential occupational base.

13          Such jobs "ordinarily involve dealing primarily with objects, rather than with data

14  or people, and they generally provide substantial vocational opportunity for persons with solely

15  mental impairments who retain the capacity to meet the intellectual and emotional demands of

16  such jobs on a sustained basis."  Id.  Unskilled work involves little or no judgment to do simple

17  duties that can be learned on the job in a short period of time.  This is in contrast to semi-skilled

18  or skilled work which may require alertness, close attention, or coordination and dexterity to do

19  repetitive tasks quickly.  20 C.F.R. § 404.1568.  The ALJ's limitations correspond to plaintiff's

20  limitations to simple repetitive tasks and entry level work.  Because the ALJ's finding at Step

21  Two was proper, she was only required to consider the limitations as a result of his learning

22  disability, which she properly analyzed.  Plaintiff's non-exertional limitation was not sufficiently

23  severe to warrant departure from the grids.  Although the vocational expert was called, the ALJ

24  was not required to pose a hypothetical where plaintiff has only less than moderate mental

25  limitations.  Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007).

26  ////

1  CONCLUSION

2          Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is

3  denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is

4  entered for the Commissioner.

5  DATED: April 24, 2012

6                              /s/ Gregory G. Hollows
                        UNITED STATES MAGISTRATE JUDGE

7  GGH/076/Beaupre0459.ss.wpd

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26